# In the United States Court of Federal Claims

No. 07-7C
Filed: March 30, 2007
**TO BE PUBLISHED**

| | |
|---|---|
| MANAGEMENT SOLUTIONS & SYSTEMS, INCORPORATED,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant, and<br><br>CREATIVE COMPUTING SOLUTIONS, INCORPORATED,<br><br>Defendant-Intervenor. | Administrative Procedure Act, 5 U.S.C. §§ 701, *et. seq.*;<br>Intervenor as a Matter of Right, RCFC 24(a);<br>Jurisdiction;<br>Modification;<br>Motion for Judgment on the Administrative Record, RCFC 52.1;<br>Permanent Injunction;<br>Post-Award Bid Protest, 28 U.S.C. § 1491(b)(1);<br>13 C.F.R. §§ 124.504(c), 124.512. |

**Cyrus E. Phillips IV**, Washington, D.C., counsel for plaintiff.

**Roger A. Hipp**, United States Department of Justice, Civil Division, Washington, D.C., counsel for defendant.

**Andrew P. Hallowell**, Pargament & Hallowell PLLC, Washington, D.C, counsel for intervenor-defendant.

**MEMORANDUM OPINION AND FINAL ORDER**

**BRADEN,** ***Judge.***

## I. RELEVANT FACTS AND PROCEDURAL HISTORY.[1]

---

[1] The relevant facts herein recited were derived from: Management Solutions & Systems, Inc. ("MSSI")'s January 5, 2007 Complaint ("Compl."); MSSI's January 5, 2007 Motion for Preliminary Injunction ; Creative Computing Solutions, Inc. ("CCSI")'s January 9, 2007 Motion to Intervene and Memorandum in Support ("Int. Inv. Mem."); MSSI's January 10, 2007 Response to CCSI's Motion to Intervene ("Pl. Inv. Resp."); the Government's January 10, 2007 Motion to Dismiss; MSSI's

Section 8(a) of the Small Business Act, 15 U.S.C. § 637(a), authorizes the United States Small Business Administration ("SBA") to enter into procurement contracts with other federal agencies and to subcontract performance of these contracts to socially and economically disadvantaged small businesses. *See* Pub. L. No. 85-536, § 8(a), 72 Stat. 384, 389 (1958) (codified as amended at 15 U.S.C. § 637(a) (1988)).[2]

In June 2002, MSSI was awarded a Section 8(a) contract[3] to provide help desk support services to the United States Department of Housing and Urban Development ("HUD")'s Public and Indian Housing Information Center ("PIC"), a unit within HUD's Office of Public and Indian Housing's Real Estate Assessment Center. *See* AR at 1. The contract was effective as of July 1, 2002. *Id.* at 2. Subsequently, the performance period was extended through December 31, 2005. *Id.* On January 6, 2006, MSSI was awarded a bridge contract[4] to continue help desk support services through June 30, 2006. *Id.* On June 28, 2006, MSSI was awarded a second bridge contract, Contract No. C-OPC-23038 ("MSSI Contract"), to extend services through December 31, 2006, for $916,050. *Id. at* 49-76.

On September 8, 2005, HUD issued a Presolicitation Notice for proposed Solicitation No. R-OPC-22889, a competitive small business set-aside for a proposed 12 month contract, with two 12 month option periods, for the continuation of PIC help desk support services. *Id.* at 43-46. On March 7, 2006, this proposed Solicitation was modified and was announced for electronic release on or about May 31, 2006. *Id.* That release did not take place. *Id.*

---

January 11, 2007 Response; the Government's January 29, 2007 Reply; MSSI's February 5, 2007 Sur-Reply; the January 10, 2007 hearing ("TR 1-54"); MSSI's February 12, 2007 Motion For Judgment on the Administrative Record, Brief in Support ("Pl. AR Br."), and Statement of Facts in Support; the Government's March 5, 2007 Cross-Motion and Response to MSSI's Motion for Judgment on the Administrative Record ("Gov't AR Resp.") and Statement of Facts in Support; the Government's March 5, 2007 Counter-Statement of Facts; CCSI's March 5, 2007 Memorandum in Opposition to MSSI's Motion for Judgment on the Administrative Record and in Support of the Government's Cross-Motion ("Int. Mem."); MSSI's March 7, 2007 Reply and Response to the Government's Cross-Motion ("Pl. AR Resp."); the Government's March 23, 2007 Reply ("Gov't AR Reply"); and the Administrative Record ("AR 1-101").

[2] In addition to helping participants obtain government contracts, SBA provides financial, technical, and managerial support throughout the course of contract performance. *See* 15 U.S.C. § 636(j)(10). The purpose of the Section 8(a) program is to foster the development of participants into economically viable firms capable of competing without special assistance. *See* 15 U.S.C. §§ 631(d)(2), 631(f)(1); *see also* S. REP. NO. 1070 at 16, 95th Cong., 2d Sess., *reprinted in* U.S.C.C.A.N. 3835, 3850.

[3] Contract No. C-OPC-22140.

[4] Contract No. C-OPC-22975.

On September 28, 2005, SBA's Washington Metropolitan Area District Office accepted CCSI's offer as a Section 8(a) contractor to provide help desk support services for HUD's Real Estate Assessment Center. *Id.* at 11. On September 28, 2005, SBA sent HUD's Western (Denver) Field Contracting Operations a letter stating that:

> Our preliminary analysis indicates that this requirement is suitable for 8(a) contracting and that Creative Computing Solutions, Inc., Participant, has requisite capabilities to satisfactorily perform the work.
>
> A determination has been made that acceptance of this procurement will cause no adverse impact on another small business concern.
>
> You are authorized to negotiate and contract directly with the 8(a) Participant; however, SBA reserves the right to be present at an Agency's negotiations with the 8(a) Participant. You are required to execute and distribute one copy of the contract award package to our office within 10 days of final signature. Please reference SBA Acceptance No. 0353-05-509359.
>
> The servicing SBA District Office, shall upon request, be available to assist the program participant in contract administration. This office will also perform on-site contract surveillance reviews, if necessary, to ensure compliance, identify problems and recommend corrective actions.

*Id.* at 11.

On September 28, 2005, HUD's Western Field Contracting Operations issued to CCSI Contract No. C-DEN-02014 ("CCSI Contract"), effective for a base year of 12 months, with two 12 month option periods, and an estimated total value of $4,268,508.36. *Id.* at 12-42.[5]

In August 2006, HUD's Real Estate Assessment Center commenced discussions with HUD's Western Field Contracting Operations to include in the CCSI Contract PIC help desk support services that MMSI was performing. *Id.* at 99. On December 1, 2006, CCSI's Contract was modified

---

[5] On March 7, 2006, MSSI filed a voluntary petition for reorganization under Title 11 of the Bankruptcy Act, 11 U.S.C. §§ 1101-1330, and proceedings are pending in the United States Bankruptcy Court for the District of Maryland. *See* AR at 47-48 (referring to *In re Management Solutions & Systems, Inc.*, Bankruptcy Petition No. 06-11211). MSSI continues the operations of business as a debtor-in-possession. *Id.*

to add PIC help desk support services. *Id.* at 77-95 (Modification No. M0009). The "Amendment of Solicitation/Modification of Contract" included the following description:

> A. This modification adds the PIC Help Desk services in accordance with the attached.
>
> B. This modification increases the contract value by $698,992.85 in accordance with CLIN 0006 and CLIN 0007 from $3,304,034.74 to $4,003,027.59.
>
> C. This modification increases the obligated amount by $698,992.85 from $2,948,222.10 to $3,647,214.95.
>
> D. All other terms and conditions remain the same.

*Id.* at 77. Modification No. M0009 ("Modification") was effective December 1, 2006. *Id.*

On December 6, 2006, MSSI filed a protest of the Modification ("B-299235") with the Government Accountability Office ("GAO"), pursuant to the Competition in Contracting Act. *Id.* at 98.

On December 12, 2006, SBA's Washington Metropolitan Area District Office sent an e-mail to HUD's Western Field Contracting Operations stating: "CCSI is in compliance with 8(a) program rules & regulations. They are also eligible for additional work. Please proceed with the modification. Sorry for the wait." *Id.* at 96. On December 13, 2006, SBA sent another e-mail to HUD stating: "You are authorized to increase the contract amount by the approximate $1.47 over the next two years, including the phase in period." *Id.* at 97. SBA, however, made no determination as to whether any "adverse impact" would result from HUD's transferring to CCSI PIC help desk support services that MSSI was then performing. *Id.*; *see also* 13 C.F.R. § 124.504(c) ("SBA will not accept a procurement for award as an 8(a) contract if . . . SBA has made a written determination that acceptance of the procurement for 8(a) award would have an adverse impact on . . . small business[.]").

On December 28, 2006, HUD's Director of Contracting issued a Determination and Finding that the automatic stay provisions of the Competition in Contracting Act are not applicable to MSSI's bid protest, but, even if they were applicable, "it is in the best interests of the United States to continue the performance under the approved in-scope modification of the Section 8(a) competitively awarded CCSI Contract." *See* AR at 1-6; *see also* 31 U.S.C. § 3553(d)(3)(A) ("If the Federal agency awarding the contract receives notice of a protest in accordance with this section . . . the contracting officer may not authorize performance of the contract to begin while the protest is pending[.]"); *Id.* § 3553(d)(3)(C) (allowing an agency head to override the mandatory stay in contract performance upon determination that "performance of the contract is in the best interests of the United States" or "urgent and compelling circumstances that significantly affect interests of the United States will not permit waiting" for the GAO's resolution of the bid protest); *see also* 48

C.F.R. § 33.104(c)(1) ("When the agency receives notice of a protest from the GAO . . . the contracting officer shall immediately suspend performance or terminate the awarded contract[.]").

In a January 4, 2007 Declaration, the Contracting Officer represented that in making the "determination that modifying the CCSI [C]ontract to add the PIC [h]elp [d]esk services was within the scope of the original contract," the following findings were made: "[t]he CCSI contract clearly states that HUD may add other programs and processes to the [Technical Assistance Center]"; "[t]he modification of the CCSI [C]ontract was not significant"; "[t]he CCSI [C]ontract required the same expertise in most (if not all) of the subject matter areas covered by the PIC [h]elp [d]esk"; "there would be no significant change in the nature of the contract, which is to operate a help desk and it would not attract a different field of competitors"; and "[t]he change in CCSI's contract price is not significant." *See* AR at 99-100.

On January 5, 2007, MSSI filed a Complaint, together with a Motion for Preliminary Injunction, in the United States Court of Federal Claims. Count I of the Complaint alleged that HUD's December 28, 2006 decision to proceed with performance of the Modification ("Override Decision") was unlawful, because HUD did not uphold the requirements of 31 U.S.C. § 3553(d)(3)(C) and Federal Acquisition Regulation ("FAR") 33.104(c). *See* Compl. ¶¶ 14-16. Count II alleged that the transfer of PIC help desk support services to CCSI was unlawful, because SBA did not determine, pursuant to 13 C.F.R. § 124.504(c)(2), whether the transfer of these help desk support services would have an adverse impact on MSSI. *See* Compl. ¶¶ 17-20. The Complaint requested declaratory relief and an injunction prohibiting CCSI's contract performance under the Modification, until the GAO has decided MSSI's protest. *Id.* at 14, ¶¶ 1-3. The Complaint also requested "such further and other relief as the [c]ourt may deem just and proper." *Id.* at 14, ¶ 4.

On January 8, 2007, the court convened a telephone status conference. On January 9, 2007, CCSI filed a Motion to Intervene and a Memorandum in support, which the court granted. On January 9, 2007, the Government also filed a Response to MSSI's Motion for Preliminary Injunction. On January 10, 2007, MSSI filed a Response to CCSI's Motion to Intervene.[6] On January 10, 2007, a copy of the Administrative Record was also filed. On January 10, 2007, the court held a hearing on the Motion for Preliminary Injunction. *See* TR 1-54. Later that day, the court was advised that GAO dismissed MSSI's bid protest, because it "was the subject of litigation before a court of competent jurisdiction." *See* 4 C.F.R. § 21.11(b). On the same day, the Government filed a Motion to Dismiss the Complaint as moot. On January 11, 2007, MSSI filed a Response to the Government's Motion to Dismiss. On January 12, 2007, the court convened a telephone status conference to discuss further proceedings in light of the GAO's dismissal of MSSI's bid protest. On

---

[6] To allow CCSI to participate in the January 10, 2007 hearing, the court granted CCSI's Motion to Intervene late in the afternoon on January 9, 2007, after considering MSSI's objections during the January 8, 2007 telephone status conference. MSSI then filed a written Response to CCSI's Motion to Intervene on January 10, 2007, which the court has reviewed as a Motion for Reconsideration, which is denied.

January 29, 2007, the Government filed a Reply to MSSI's Response. On February 5, 2007, MSSI filed a Sur-Reply. On February 5, 2007, the court convened a telephone status conference, pursuant to which the court entered an Order: granting MSSI's oral Motion to Withdraw Count I of the January 5, 2007 Complaint, seeking review of HUD's December 29, 2006 Override Decision, and the December 29, 2006 Motion for a Preliminary Injunction; and granting the Government's oral Motion to Withdraw the January 10, 2007 Motion to Dismiss.

On February 8, 2007, the court convened another telephone status conference and, thereafter, entered a Scheduling Order.

On February 12, 2007, MSSI filed: a Motion for Judgment on the Administrative Record; a Brief in support; and a Statement of Facts in support. On March 5, 2007, the Government filed: a Response to MSSI's Motion for Judgment on the Administrative Record and Cross-Motion; a Statement of Facts in support; and a Counter-Statement of Facts. On that date, CCSI also filed a Memorandum in Opposition to MSSI's Motion for Judgment on the Administrative Record and in Support of the Government's Cross-Motion. On March 7, 2007, MSSI filed a Response and Reply. On March 23, 2007, the Government filed a Reply.

## II. DISCUSSION.

### A. Jurisdiction.

The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996 ("ADRA"), Pub. L. No. 104-320, §§ 12(a), (b), 110 Stat. 3870 (1996), authorizes the United States Court of Federal Claims to "render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1); *see also Banknote Corp. of Am., Inc.* v. *United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004) ("The [United States] Court of Federal Claims has jurisdiction to review both pre-award and post-award bid protests pursuant to 28 U.S.C. § 1491(b), enacted as part of the Administrative Dispute Resolution Act of 1996[.]").

The Amended Complaint alleges that HUD violated 13 C.F.R. § 124.504(c) by transferring PIC help desk support services to CCSI, without conducting an analysis of the adverse impact on MSSI. *See* Am. Compl. ¶¶ 17-20. This allegation recites a sufficient basis for the court to exercise jurisdiction, pursuant to 28 U.S.C. § 1491(b)(1).

MSSI's February 12, 2007 Motion for Judgment on the Administrative Record requests an order compelling termination of the Modification, *i.e.*, a permanent injunction. *See* Pl. AR Br. at 12. CCSI argues that this request falls "outside the four corners of the Complaint," because the Amended Complaint merely requests an injunction "until such time as the [GAO] has decided the matter before it in B-299235." *See* Int. Mem. at 8 (citing Am. Compl. at 14, ¶3). Although the court acknowledges that the Amended Complaint does not specifically request a permanent injunction, the

court has determined that the Amended Complaint's request for "further relief as the [c]ourt may deem just and proper" is sufficiently broad to include a permanent injunction. *See* Am. Compl. 14, ¶ 4; *see also* RCFC 54(c) ("[E]very final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings.").

**B. Standing.**

As a threshold matter, a protester must establish that it is an "interested party." 28 U.S.C. § 1491(b)(1). The United States Court of Appeals for the Federal Circuit has construed the term "interested party" as synonymous with "interested party," as defined by the Competition in Contracting Act, 31 U.S.C. § 3551.[7] *See Rex Serv. Corp.* v. *United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006) (citations omitted); *see also Banknote Corp.*, 365 F.3d at 1352 (holding that the United States Court of Federal Claims' jurisdiction under the Tucker Act, as amended, is "limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract"). A two-part test is applied to determine whether a protester is an "interested party" *i.e.*, the protestor must show that it was an *actual or prospective bidder* and the protester must have a *direct economic interest* in the procurement. *See Rex Serv. Corp.*, 448 F.3d at 1307 ("[T]o come within the [United States] Court of Federal Claims' section 1491(b)(1) bid protest jurisdiction, [the protester] is required to establish that it (1) is an actual or prospective bidder, and (2) possesses the requisite direct economic interest." (citations omitted)) (emphasis added).

In addition to establishing status as an "interested party," under 28 U.S.C. § 1491(b)(1), a protestor must also show that any alleged errors caused "prejudice." *See Galen Med. Assocs.* v. *United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) ("'[T]o prevail in a protest the protestor must show not only a significant error in the procurement process, but also that the error prejudiced it.'" (quoting *Data Gen. Corp.* v. *Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996) (alterations in original)); *see also Myers Investigative & Sec. Servs., Inc.* v. *United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002) ("prejudice (or injury) is a necessary element of standing."). The United States Court of Appeals for the Federal Circuit has advised that "because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached *before* addressing the merits." *Info. Tech. & Applications Corp.* v. *United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (emphasis added); *see also* Myers, 275 F.3d at 1369 ("standing is a threshold jurisdictional issue[.]" (citations omitted)).

---

[7] The term "'interested party,' with respect to a contract or a solicitation or other request for offers described in paragraph (1), means an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." 31 U.S.C. § 3551(2)(A).

The United States Court of Appeals for the Federal Circuit has held that a protestor can establish prejudice by showing a "substantial chance" that it would have received the award if the error was corrected. *See Bannum, Inc.* v. *United States*, 404 F.3d 1346, 1353 (Fed. Cir. 2005) ("To establish prejudice Bannum was required to show that there was a 'substantial chance' it would have received the contract award but for . . . errors in the bid process.") (citations omitted); *see also Statistica, Inc.* v. *Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996) ("To establish competitive prejudice, a protestor must demonstrate that but for the alleged error, there was a '*substantial chance*' that [it] would receive an award-that is was within the zone of active consideration." (internal citations omitted) (emphasis and alterations in the original)).

Certainly, the question of prejudice turns, in part, on the relationship between the protestor(s) and the specific procurement process that is being challenged. Moreover, the United States Court of Appeals for the Federal Circuit has held that the issue of prejudice may be dependent upon the type of relief sought by the parties:

> In *Impresa* [*Construzioni Geom. Domenico Garufi* v. *United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001),] we considered the standard to be applied where the plaintiff claims that the government was obligated to rebid the contract (as contrasted with a situation in which the plaintiff claims that it should have received the award in the original bid process). [] To have standing, the plaintiff need only establish that it 'could compete for the contract' if the bid process were made competitive. . . . [Plaintiff] *need not* show that it would have received the award in competition with other hypothetical bidders, [but rather] must show that it would have been a qualified bidder.

*Myers*, 275 F.3d at 1370 (emphasis added; citations omitted).

### 1. Plaintiff Has Standing.

MSSI was performing PIC help desk support services, before HUD added these services to the CCSI Contract. *See* AR at 49-76. HUD's decision to modify the CCSI Contract directly affects the economic interests of MSSI by depriving MSSI of the opportunity to compete for the procurement through September 28, 2008. *See* AR at 78; *see also* Pl. AR Br. at 11. Accordingly, MSSI is an "interested party." *See* 28 U.S.C. § 1491(b)(1); *see also Am. Fed'n Gov't. Employees*, 258 F.3d at 1302 ("We . . . hold that standing under [28 U.S.C.] § 1491(b)(1) is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract.").

As previously discussed, the use of the "substantial chance" test depends, in part, on the procurement context and relief sought. *See Myers Investigative*, 275 F.3d at 1370 ("To have standing, the plaintiff *need only establish* that it 'could compete for the contract' if the bid process were made competitive." (emphasis added; internal citations omitted)). In this case, the procurement at issue was a modification to a previously existing contract and was not the result of a competitive

bid process. *See* AR at 77. If a competitive bid process had occurred, MSSI would have been qualified to compete for the procurement, because it had performed these services in the past. *See* AR at 49-76. Accordingly, an alleged error in the procurement process would prejudice MSSI. For this reason, the court has determined that Plaintiff has standing to bring this bid protest.

**2. Intervenor-Defendant Has Standing.**

On January 9, 2007, the court granted CCSI's January 9, 2007 Motion to Intervene, pursuant to Rules 5 and 24(a) of the United States Court of Federal Claims. In relevant part, Rule 24(a) provides:

> Upon timely application anyone shall be permitted to intervene in an action: . . . when the applicant claims an *interest relating to the property or transaction which is the subject of the action* and the applicant is so situated that the *disposition of the action may* as a practical matter *impair or impede the applicant's ability to protect that interest*, unless the applicant's interest is adequately represented by existing parties.

RCFC 24(a) (emphasis added); *see also Am. Mar. Transp., Inc.* v. *United States*, 870 F.2d 1559, 1561 (Fed. Cir. 1989) ("Intervention is proper only to protect those interests which are of such a *direct* and *immediate* character that the intervenor will either gain or lose by the *direct* legal operation and effect of the judgment." (internal quotations & citations omitted)). The United States Court of Appeals for the Federal Circuit has held that "the requirements for intervention are to be construed in favor of intervention." *Am. Mar. Transp.*, 870 F.2d 1561 (citing *Westlands Water Dist.* v. *United States*, 700 F.2d 561, 563 (9th Cir.1983)).

The United States Court of Appeals for the Federal Circuit requires the trial court to evaluate three factors in determining whether an intervention is timely: "(1) the length of time during which the would-be intervenor[s] actually knew or reasonably should have known of [their] right[s;] (2) whether the prejudice to the rights of existing parties by allowing intervention outweighs the prejudice to the would-be intervenor[s] by denying intervention[;] (3) existence of unusual circumstances militating either for or against a determination that the application is timely." *Belton Indus., Inc.* v. *United States*, 6 F.3d 756, 762 (Fed. Cir. 1993) (citation omitted and certain alterations in original). In this case, CCSI filed a Motion to Intervene four days after MSSI filed the original Complaint. Under these circumstances, the court discerned no prejudice to the principal parties or any unusual circumstances militating against intervention. Therefore, the court determined that CCSI's Motion to Intervene was timely.

CCSI also has "an interest relating to property or transaction which is the subject of [this] action," because CCSI was awarded the requirement at issue, through the Modification to its contract

with HUD.[8] *See* AR at 77. If the relief requested by MSSI is granted, CCSI's work under the Modification will cease, causing monetary loss and the termination of employees. *See* Int. Inv. Mem. at 2. Therefore, final judgment in favor of MSSI will "impair" CCSI's "ability to protect that interest." RCFC 24(a).

The Government cannot adequately represent CCSI's interest, because the parties do not have identical interests. The Government could, at any point in the proceedings, take a position or action that conflicts with CCSI's interests. Moreover, CCSI may be able to provide relevant information that the Government does not possess. Accordingly, CCSI has satisfied the third element of RCFC 24(a). For these reasons, the court has determined that CCSI has standing to intervene in this bid protest case.

### C. The Relevant Standards For Decision On The Administrative Record In A Bid Protest Case.

Pursuant to the Tucker Act, as amended by the ADRA, the United States Court of Federal Claims reviews challenges to agency decisions, pursuant to the standards set forth in the Administrative Procedure Act, 5 U.S.C. § 706. *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."); *see also* 5 U.S.C. § 706(2)(A) ("[T]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]").

The United States Court of Appeals for the Federal Circuit has held that "a bid award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Galen Med. Assocs.,* 369 F.3d at 1329 (internal citations omitted); *see also Bannum,* 404 F.3d at 1351 (holding that trial courts initially must determine if the Government "acted without rational basis or contrary to law when evaluating the bids and awarding the contract."); *Banknote Corp.*, 365 F.3d at 1350-51 ("Among the various APA standards of review in section 706, the proper standard to be applied in bid protest

---

[8] MSSI argues that: "[CCSI's] 'interests,' which are nothing more than an expectation of continued revenues as a subcontractor under a prime contract between [HUD and FSBA], a prime contract that can be Terminated for the Convenience of [HUD] at any time, are not the sort of 'interests' cognizable by this Court." *See* Pl. Inv. Resp. at 2-3 (citing *United States* v. *Munsey Trust Co.*, 332 U.S. 234, 241 (1947) (holding "laborers and materialmen" did not have enforceable rights against the United States)); *but see CHE Consulting, Inc.* v. *United States*, 71 Fed. Cl. 634 (2006) (holding subcontractor was entitled to intervene as of right in pre-award bid protest, because: subcontractor had an interest relating to the subject of the protest and was so situated that disposition of the action might impair or impede its ability to protect that interest; and there was a likelihood that its interest might not be adequately protected by the Government).

cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (citation omitted)).

A protester bears a 'heavy burden' of showing that an award decision had no rational basis. *See Impresa*, 238 F.3d at 1332-33. Therefore, when the court finds a "reasonable basis" for an agency's action, the court should "stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Honeywell, Inc.* v. *United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (citation omitted). This standard recognizes a zone of acceptable results in each particular case and requires that the final decision reached by an agency is the result of a process that "consider[s] the relevant factors" and is "within the bounds of reasoned decision making." *Baltimore Gas & Elec. Co.* v. *Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983); *see also Impresa*, 238 F.3d at 1333-34 ("[T]he test for reviewing courts is to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." (citation & internal quotations omitted)).

If a trial court finds that an agency's decision-making fails an APA review, the court must then inquire whether the protester was prejudiced by the Government's conduct. *See Bannum*, 404 F.3d at 1351 ("[I]f the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct."); *see also Impresa*, 238 F.3d at 1333 ("When a challenge is brought on the second ground, the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'" (citations omitted)). A claim on the merits of a bid protest will only succeed if both requirements are satisfied. *Bannum*, 404 F.3d at 1351; *see also Galen Med. Assocs.*, 369 F.3d at 1330 ("'[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it.'" (quoting *Data Gen. Corp.*, 78 F.3d at 1562) (alterations in original)). Prejudice, in this context, requires the protestor to show a "substantial chance" that it would have received the contract award, but for the APA error. *See Bannum*, 404 F.3d at 1358 ("To establish prejudice, Bannum was required to show that there was a 'substantial chance' it would have received the contract award but for the . . . errors in the bid process."); *see also Metcalf Constr. Co., Inc.* v. *United States*, 53 Fed. Cl. 617, 622 (2002) ("[M]inor errors or irregularities, *i.e.*, *harmless errors*, committed in the course of the procurement process are not sufficient grounds to warrant judicial intrusion to upset a procurement decision." (citation omitted) (emphasis added)).

Not every violation of the APA demands an equitable remedy: "We thus hold that, in a bid protest action, section 1491(b)(4) does *not* automatically require a court to set aside an arbitrary, capricious, or otherwise unlawful contract award." *PGBA*, *LLC.* v. *United States*, 389 F.3d 1219, 1226 (Fed. Cir. 2004) (emphasis added). In *PGBA*, the United States Court of Appeals for the Federal Circuit affirmed a ruling by the United States Court of Federal Claims where a protestor's claim for injunctive relief was denied in "public interest grounds," even though the plaintiff established prejudicial error in the procurement process. *Id.* at 1223 ("TMA . . . made several

prejudicial errors in its evaluations of the technical merits of PGBA's and WPS's proposals . . . however, the [United States Court of Federal Claims] concluded that the balance of hardships and the public interest favored allowing TMA and WPS to proceed with the contract."). The United States Court of Appeals for the Federal Circuit reasoned, "there is no evidence that Congress intended to abolish the tradition of equitable discretion in issuing injunctive relief when it enacted section 1491(b)(4) in ADRA." *Id.* at 1227; *see also id.* at 1226 ("This construction is consistent with the language of 28 U.S.C. § 1491(b)(2), which, through use of the permissive 'may,' provides the United States Court of Federal Claims with discretion in fashioning relief."). Accordingly, procurement error does not necessarily *require* the trial court to order equitable relief, but instead to *decide* whether to issue the injunction. *Id.* at 1228 (listing the traditional four factors that the trial court should use in determining whether to issue a permanent injunction) (emphasis added).

### D. The Court's Resolution Of The Parties' Cross-Motions For Judgment On The Administrative Record.

#### 1. Plaintiff's Arguments.

MSSI contends that the Modification is "clearly unlawful," because it was made in violation of SBA's "adverse impact" rule, pursuant to 13 C.F.R. § 124.504(c). Pl. AR Br. at 9.

The adverse impact rule provides:

> SBA will not accept a procurement for award as an 8(a) contract if[:]
>
> (c) Adverse impact. SBA has made a written determination that acceptance of the procurement for 8(a) award would have an adverse impact on an individual small business, a group of small businesses located in a specific geographical location, or other small business programs. The adverse impact concept is designed to protect small business concerns which are performing Government contracts awarded outside the 8(a) [Business Development ("BD")} program, and does not apply to follow-on or renewal 8(a) acquisitions. SBA will not consider adverse impact with respect to any requirement offered to the 8(a) program under Simplified Acquisition Procedures.
>
> > (1) In determining whether the acceptance of a requirement would have an adverse impact on an individual small business, SBA will consider all relevant factors.
> >
> > > (i) In connection with a specific small business, SBA presumes adverse impact to exist where:
> > >
> > > > (A) The small business concern has performed the specific requirement for at least 24 months;

> (B) The small business is performing the requirement at the time it is offered to the 8(a) BD program, or its performance of the requirement ended within 30 days of the procuring activity's offer of the requirement to the 8(a) BD program; and
>
> (C) The dollar value of the requirement that the small business is or was performing is 25 percent or more of its most recent annual gross sales (including those of its affiliates). For a multi-year requirement, the dollar value of the last 12 months of the requirement will be used to determine whether a small business would be adversely affected by SBA's acceptance.
>
> * * *
>
> (2) In determining whether the acceptance of a requirement would have an adverse impact on a group of small businesses, SBA will consider the effects of combining or consolidating various requirements being performed by two or more small business concerns into a single contract which would be considered "new" requirement as compared to any of the previous smaller requirements. SBA may find adverse impact to exist if one of the existing small business contractors meets the presumption set forth in paragraph (c)(1)(i) of this section.

13 C.F.R. § 124.504(c)(1), (2).

MSSI argues that the "adverse impact" rule applies to the Modification, because it entailed a consolidation of services being performed by two different small businesses. *See* Pl. AR Br. at 10 (citing 13 C.F.R. § 124.504(c)(2)). MSSI further argues that SBA should have found that an adverse impact existed, because the requirements were met: in December 2006, MSSI had been performing PIC help desk support services for at least 24 months; MSSI was performing these services when HUD offered them to the Section 8(a) BD Program; and the dollar value of the requirement that MSSI was performing in 2006 was 25 percent or more of MSSI's gross sales for the last 12 months. *Id*.

**2. The Government's Arguments.**

The Government counters that "MSSI's motion is based upon the erroneous premise that SBA was required to make an adverse impact determination," before HUD could modify the CCSI Contract. *See* Gov't AR Resp. at 2. First, the Government argues that 13 C.F.R. § 124.504(c) only requires an "adverse impact" analysis when a "procurement" is offered and accepted for award as

a Section 8(a) contract, but not when an existing contract is modified. *Id.*; *see also* Int. Mem. at 3-5. Second, the Government contends that 13 C.F.R. § 124.512[9] provides that SBA's consent to a contract modification is not required, if SBA has delegated contract administration to the procuring agency and the modification is within the scope of the original contract. *See* Gov't AR Resp. at 2 (citing 13 C.F.R. § 124.512). The Government also notes that if the "adverse impact" rule were applicable, MSSI would need to show that the PIC help desk support services were equal to 25 percent or more of its most recent annual gross sales, evidence that is not included in the Administrative Record. *Id*. at 6-7 ("MSSI's statement of facts and brief are replete with citations to matters outside the administrative record, including testimony and exhibits offered" at the January 10, 2007 hearing.); *see also* Int. Mem. at 6-7 (stating that if MSSI had moved under RCFC 56, CSSI would have had the opportunity submit affidavits to counter Plaintiff's sales data);13 C.F.R. § 124.504(c)(1)(i)(C) (requiring that the value of the services that the small business was performing be 25 percent or more of its most recent annual gross sales).

**3. The Court's Resolution.**

The court has determined that the Modification is not subject to 13 C.F.R. § 124.504. 13 C.F.R. § 124.504 provides that "SBA will not accept a *procurement for award as an 8(a) contract* if" several circumstances exist, including the determination of an adverse impact on a small business. 13 C.F.R. § 124.504 (emphasis added). To form an initial 8(a) contract, the procuring agency is required to offer the "procurement" to the SBA Section 8(a) program by a "written offering letter." *See* 13 C.F.R. § 124.502 (procedure for offering a procurement to SBA for award through the 8(a) BD Program); *see also* Int. Mem at 4-5. The SBA then decides whether to accept the procurement, in accordance with the criteria of 13 C.F.R. § 124.504. *See* 13 C.F.R. § 124.503 (procedure for SBA acceptance of a procurement for award through the 8(a) BD Program); *see also* Int. Mem at 4-5. A modification, however, does not require a formal "offer," and therefore does not require a formal

---

[9] 13 C.F.R. § 124.512, on delegation of contract administration to procuring agencies, provides:

> (a) SBA may delegate, by the use of special clauses in the 8(a) contract documents or by a separate agreement with the procuring activity, all responsibilities for administering an 8(a) contract to the procuring activity except the approval of novation agreements under 48 C.F.R. 42.302(a)(25).
>
> (b) This delegation of contract administration authorizes a contracting officer to execute any priced option or *in scope modification without SBA's concurrence*. The contracting officer must, however, notify SBA of all modifications and options exercised.

13 C.F.R. § 124.512 (emphasis added).

"acceptance" in accordance with the criteria of 13 C.F.R. § 124.504, including an adverse impact determination.

The court is satisfied that the Modification was within the scope of the initial CCSI Contract and was not a separate Section 8(a) procurement. Here, the court is informed by the Court of Appeals for the Federal Circuit's use of various tests to distinguish between a "modification within the scope" and a "cardinal change" *i.e.*, whether "the government effects an alteration in the work so drastic that it effectively requires the contractor to perform duties materially different from those originally bargained for"; "whether a modification exceeds the scope of the contract's changes clause"; and "whether the modification is of a nature which potential offerors would reasonably have anticipated." *See AT&T Commc'ns, Inc.* v. *Wiltel*, 1 F.3d 1201, 1204, 1208 (Fed. Cir. 1993) (holding that the concepts of "modification within the scope" and cardinal change, which were originally developed as tests of whether a modification constitutes breach of contract, also should be used to determine whether a modification was significant enough to trigger the Competition in Contracting Act) (internal citations omitted); *see also* Gov't AR Resp. at 3-4. In this case, the Modification did not change the purpose of the CCSI contract – to provide help desk support services for the business areas of HUD's Real Estate Assessment Center. *See* AR at 3, 14,[10] 99. The Modification added a comparatively small unit of help desk support services for the PIC, which is also part of the Real Estate Assessment Center. *Id.* at 99 ("Two tasks would be added to the existing twelve tasks. The hours of operation would not change[,] [although the number of calls would increase[. ] . . . Based on the overall contract [,][the Modification] represents a 24% [price] increase."); *see also* Gov't AR Resp. at 5. Moreover, in performing the initial CCSI Contract, CCSI frequently received and

---

[10] The "Purpose" section of the CCSI Contract provides:

> 1.1.1. Operate a [Technical Assistance Center] Hotline from 7:00 AM to 8:30 PM EST Monday through Friday, excluding Government holidays and certain times when the [Technical Assistance Center] is closed for the convenience of the Government.
>
> 1.2.1. Provide assistance by answering general program status and technical questions from inspectors, HUD Field Offices, housing authorities, management agents, residents, sponsors, other HUD and government officials and the general public.
>
> 1.2.2. Answer questions about PIH-[Real Estate Assessment Center] business processes and resolve problems users may experience with PIH-[Real Estate Assessment Center] systems.
>
> 1.2.3. Support communications with program participants in selected business areas.

AR at 14.

responded to PIC-related inquiries. *See* AR at 3, 99 ("The CCSI contract required the same expertise [as the PIC help desk][.]"); *see also* Gov't AR Resp. at 5. More importantly, the initial CCSI Contract provided that "HUD may subsequently include additional programs and processes as deemed necessary to operate a [Technical Assistance Center *i.e.,* help desk]." *See* AR at 16; *see also CW Government Travel* v. *United States*, 61 Fed. Cl. 559, 574 (2004) (holding that "[a] modification generally falls within the scope of the original procurement if potential bidders would have expected it to fall within the contract's changes clause" (citation omitted)); *HDM Corp.* v. *United States*, 69 Fed. Cl. 243, 257 (2005) (holding that there was no material change in a contract where a reasonable offeror would have expected changes to fall within contract's changes clause). Accordingly, the Modification was "within the scope" of the initial CSSI Contract; *see also* Gov't AR Resp. at 6.

Moreover, the court has determined that SBA delegated administration of the CCSI Contract to HUD, thereby authorizing HUD to execute the "in scope" Modification, without SBA's concurrence. *See* 13 C.F.R. § 124.512. The Government argues that the September 28, 2005 letter from SBA to HUD evidences that SBA delegated administration of CCSI's Contract to HUD:

> You are *authorized to negotiate and contract directly with the 8(a) Participant*; however, SBA reserves the right to be present at an Agency's negotiations with the 8(a) Participant. You are required to *execute and distribute one copy of the contract award package to our office* within 10 days of final signature. Please reference SBA Acceptance No. 0353-05-509359.
>
> The servicing SBA District Office, shall upon request, be available to *assist the program participant in contract administration*. This office will also perform on-site contract surveillance reviews, if necessary, to ensure compliance, identify problems and recommend corrective actions.

AR at 11 (emphasis added).

MSSI contends that the letter from SBA to HUD does not delegate contract administration authority, but only authorizes HUD to "negotiate and contract directly." *See* Pl. AR Reply at 2 (quoting AR at 11). In addition, MSSI argues that if SBA had delegated contract administration authority, HUD would not have needed to wait for SBA approval to proceed with the Modification, as evidenced in two e-mails from SBA to HUD. *See* Pl. AR Reply at 3 (citing AR at 96 (December 12, 2006 e-mail from SBA to HUD stating: "CCSI is in compliance with 8(a) program rules and regulations. They are also eligible for additional work. *Please proceed with the modification. Sorry for the wait*." (emphasis added) and 97 (December 13, 2006 e-mail from SBA to HUD stating: "You are authorized to increase the contract amount by approximate $1.47 over the next two years, including the phase in period.")). The Government counters that the e-mails were sent 11 and 12 days *after the Modification was executed*, and therefore merely indicate that the SBA was satisfied with HUD's contract administration. *See* Gov't AR Reply at 2 (emphasis added).

The court has determined that SBA's statement in the September 28, 2005 letter evidences the agency's specific "agreement" to delegate contract administration authority to HUD under 13

C.F.R. § 124.512. Although the language of the two e-mails is ambiguous, even if SBA erroneously believed that its approval was necessary for the Modification, as a matter of law, it was not required. *See* 13 C.F.R. § 124.512. Accordingly, SBA was not required to follow the regulatory requirements associated with approving a procuring agency's action.

In the December 28, 2006 Override Decision, HUD's Director of Contracting stated: "By their protest, MSSI appears to believe that, because they currently perform the contract requirements, they have a right to continue to perform the services. This is incorrect. The Government has the right to determine, within the Federal Acquisition Regulation requirement how best to obtain the services needed." *See* AR at 6. The fact remains that MSSI's Contract expired at the end of 2006 and the Government did not violate any of the applicable regulations in modifying CCSI's Contract.

## III. CONCLUSION.

For the aforementioned reasons, the Government's Motion on the Administrative Record is hereby granted and MSSI's Motion on the Administrative Record is hereby denied.

The Clerk of the United States Court of Federal Claims is directed to enter judgment for the Government.

**IT IS SO ORDERED.**

s/ Susan G. Braden
**SUSAN G. BRADEN**
**Judge**